EXHIBIT C

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| _____ | ) | |
| **TINNUS ENTEPRISES, LLC,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **Tinnus LTD.,** | ) | **Civ. Action No. 6:15-CV-00551** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TELEBRANDS CORP.,** | ) | |
| | ) | |
| **PROMETHEUS BRANDS, LLC** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BED BATH & BEYOND INC.** | ) | |
| | ) | |
| Defendants. | ) | |
| _____) | | |

## DECLARATION OF CORTLAND PUTBRESE IN SUPPORT
## OF THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Cortland Putbrese, declare:

1.      I am a partner at the law firm of Dunlap Bennett & Ludwig, PLLC. I am in good standing as a current practitioner in the Commonwealth of Virginia and in the State of West Virginia, and I am admitted to practice in the Eastern District of Texas. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to them under oath.

2.      Attached to this declaration are true and accurate copies of articles regarding Telebrands Corporation's past bankruptcies. *See* Exhibits C1 through C4.

1

3.      Attached to this declaration is a true and accurate copy of the lawsuit that the State of New Jersey has filed against Telebrands. *See* Exhibit C5.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 18, 2015 in Richmond, Virginia.


_____

CORTLAND PUTBRESE

# EXHIBIT C1

×
us
FF7 Remake
Official Reveal Trailer



Metal Gear Solid V: The Phantom Pain Gameplay Demo - E3 2015
Final Fantasy 7 is a Remake, Not a Remaster
First Look at Ghostbusters Reboot
CD Projekt Talks Cyberpunk 2077

Browse
Xbox One
Xbox 360
PS4
PS3
Vita
Wii U
3DS
PC
Mobile
Movies
TV
Tech
Comics
Reviews
Upcoming
Videos
Wikis + Cheats
Podcasts
Boards
Blogs
Search
Trailers Reviews PS4 Xbox One PC Wii U Movies TV
Sign in
Register
Prime

*Search...*

☐ Search titles only

Posted by Member:

Separate names with a comma.

Newer Than:

☐ Search this thread only
☑ Search this forum only
   ☐ Display results as threads

SEARCH          MORE...

Boards          Recent Activity          Search Boards

Boards ⟩ Archive Boards ⟩ Blog Posts ⟩ **Telebrands USA**          Jump to...

This week's board spotlight is The Crosswalk! Swing by and introduce yourself.



# Telebrands USA

Thread Status: **Not open for further replies.**

Discussion in 'Blog Posts' started by telebrands-usa, Apr 13, 2007.

Tweet  ⟨ 0   g+1  ⟩ 4          Like  ⟨ 0 ⟩

---



**telebrands-usa**
Noob

Joined: Apr 13, 2007
Messages: 1

**Date Posted: Apr 13, 2007**

**A.J. Khubani, Ajit Khubani**

President & Chief Executive Officer

**TELEBRANDS USA**

Looking back at 20 years in the business, it is difficult for **A.J. Khubani** to imagine a time when TELEbrands, his $200 million dollar company, was $13 million dollars in the red, filing for Chapter 11. The self-made millionaire has been "there and back" as they say, having sold his first product (an AM-FM radio for $10) at the age of 23, skyrocketing to $200 million dollars in annual revenue in 1995, ==plummeting to bankruptcy in 1996, and climbing out of Chapter 11 only three months later.==

**Ajit Khubani** began working for his father's import business in 1982, after graduating with a degree in business administration from Montclair State University. After gradually increasing revenue by placing strategic print ads, Khubani created an infomercial for AmberVision sunglasses in 1987. The infomercial was wildly successful, prompting sales of 15 million pairs. After considerable persuasion, Khubani convinced Herman's Sporting Goods and "ABCD" Marketing (Accelerated Brand Creation and Deployment) was born. For the next eight years, TELEbrands rode the wave of success, creating retail demand products like the Smart Mop, Magic Hangers, the State Quarters Map and the Better Pasta Pot.

==When an unexpected lawsuit drove the company to file for bankruptcy in 1996, Khubani felt the toll financially and emotionally.== However, he managed to turn the upset into an opportunity to rebuild his business from the ground up. By trial and error, Khubani has discovered the importance of a smaller staff with a strong nucleus; a brilliant management team to which he credits the company's success.

#1

Advertisement

Today, **TELEbrands** has once again exceeded expectations, having
become the driving force in the DRTV industry. The company's invention
channel can be seen on television, in print ads and catalogues, and on
the Web in 90 countries. Khubani currently resides in Saddle River, New
Jersey with his wife, Poonam and his three children.

**Ajit Khubani**
**AJ Khubani**
**A.J. Khubani**
**Telebrands**
**Telebrands USA**

telebrands-usa, Apr 13, 2007

(You must log in or sign up to reply here.)

Thread Status: **Not open for further replies.**

Tweet  0    g+1  4          Like  0

| Boards | Archive Boards | Blog Posts | **Telebrands USA** | Jump to... |

IGN
AskMen
PCMag
Techbargains
ExtremeTech
Geek
Toolbox
Copyright 1996-2015 Ziff Davis, LLC   An IGN Entertainment Games site
About Us
Advertise
Contact Us
Press
Careers
RSS Feeds
Support
Privacy Policy
User Agreement

AdChoices Cookie Consent

# EXHIBIT C2

IN THE NEWS:    GOODFELLAS    TED CRUZ    HILLARY CLINTON    NBA FINALS    CLINTON CORRECTIONAL FACILITY

HOME    SECTIONS    SEARCH                                    FOLLOW    SUBSCRIBE    SIGN IN

# MR. GIZMO

By Michael Kane                                            June 30, 2008 | 7:15am

SO, it's late at night, you're home watching Jon Stewart, and you notice that your dog, who's getting on in years, can't jump up and join you on the couch as easily as she used to. In fact, she can barely get her gnarled little paws off the ground.

Watching her struggle, a light goes off: What she needs is a miniature set of steps. Doggy steps!

Mulling that over, you come to another realization: There must be thousands of aged, arthritic pets in the same boat. You could market this thing! You could make a fortune – maybe even quit your job!

Then you go back to watching TV.

That's the difference between you and A.J. Khubani. As the president and CEO of the Fairfield, NJ-based TeleBrands, the "As Seen on TV" company, Khubani has built an empire marketing an endless stream of personal-grooming and home-improvement gadgets designed to solve everyday problems, eliminate small nuisances and otherwise bump the convenience of modern life up a notch.

In addition to Doggy Steps (more than 5 million sold), he's responsible for such "Whatever did we ever do beforehand?" necessities as the Fish Pen, a pocket-size item that telescopes into a fully functional rod and reel ("World's smallest fishing pole!"); Ear Lifts, an "ear support system" that uses adhesive to ease the burden earrings place on sagging earlobes ("Easy to apply!"); and the collapsible Flat-Fold Colander ("Easy storage!").

VA. TECH'S INSULT TO INJURY



SAVE an average of over

**$548**

a year

Zip Code

GET A QUOTE

**TRENDING NOW ON
NYPOST.COM**

71811

As distinctive as the products is TeleBrands' signature marketing vehicle: the rapid-fire infomercials whose depictions of everyday woes solved by some contraption have inspired millions of insomniac cable viewers to reach for the phone and their credit card. (Though, these days, most of TeleBrands' sales come through retail stores such as Bed Bath & Beyond, Walgreens and Wal-Mart.)

Khubani, 48, dates his fascination with gadgets back to his childhood in Union City, NJ. Growing up in a family of Indian immigrants, with a father who imported inexpensive electronics from Asia, Khubani (whose given name is Ajit) started working at 11 as a paperboy, and in the following years delivered pizzas, bussed tables at the mall and sold knives door-to-door.

He got his start in mail-order sales while still in college and continued his marketing efforts while working as a bookkeeper for his father's business. His first big score came in 1987 with AmberVision sunglasses, yellow-tinted shades that sold millions of pairs.

From there, Khubani was off and running; soon came the Go Duster, a spinning dust mop; the StickUp Bulb, a portable light with stick-on adhesive; the Get-a-Grip, a detachable handle that mounts by suction; the Smart Mop, which wrings with a twist of the handle; and dozens of others.

Not that it's been nonstop success. For one thing, Khubani is the first to admit he misses far more often than he hits. And he had a run of trouble – including a patent-infringement suit and an ill-fated Ab Flex machine that lost him millions when a competitor cornered the market – that led to a bankruptcy filing in 2000.

But Khubani was soon back on his feet and back on the air, and today he again rides high as the uncontested Gizmo King. His current chart-topper is the PedEgg, an egg-shaped callus remover with a built-in compartment to catch the shavings.

All those $9.99 items (two easy payments!) add up, and they've made Khubani wealthy. The fruits of his success include a stable of sports cars and a 21,000-square-foot mansion in Saddle River, NJ, as well as a regular slot guest-lecturing to entrepreneurial engineering students at Princeton.

Such achievements aside, as he sits in his corner office, where a bank of photos of his wife and three children sits across the room from a line of shelves loaded with Go Dusters and Clean-Cookin' Nonstick Oven Liners, Khubani is as reserved as his signature infomercials are over-the-top. He came across as modest and thoughtful as he spoke to @work about building an empire on inventions, described his most spectacular duds and explained why he'd rather work than golf.

### How did you get started?

I studied business administration at Montclair State College, and while I was finishing in 1983, I took out a mail-order ad in the National Enquirer, advertising an AM/FM radio with headphones. That was during the Walkman craze, and it was an inexpensive alternative for $9.99. My father was in the consumer electronics business, so I found a product in Taiwan and he imported 2,000 pieces for me. I spent $7,600 of my total savings of $20,000 at that time. It was a big leap of faith.

### Were you an instant success?

I sold all 2,000. It broke even. It took me until 1985 to figure out how to make a profit. I tried different items. The first big seller were $10 slippers. They had bumps on the bottom and massaged your feet as you walked.

### The company had $11 million in revenues by 1986. What was the breakthrough?

By that point, we'd discovered TV direct response, buying two-minute commercials. The first big TV item, in 1987, was AmberVision sunglasses. Also $10. That was the infancy of infomercials, the '80s.

### Your great leap forward was retail?

Absolutely. The whole biz model evolved. We built brand awareness on TV, and that enabled us to sell the product to retail stores and shipping into retail stores. Ninety









**SEE ALL**

**VIDEO**



VA. TECH'S INSULT TO INJURY

percent of our sales now are to retail. We got our first break with Herman's sporting goods, convincing them to buy the sunglasses. Here I am, two decades later, with tens of millions in revenue and a staff of about 40 people.

**What do you spend your days doing at this point?**

Working on new-product ideas. Every day, we have a meeting and brainstorm ideas. We have inventors who call us up. That's really the fun part. My daughter is 16. She comes into my office and comments, "Dad, all you do is sit around, talk about new stuff and tell other people what to do."

**How would you define what kind of thing you're looking for?**

We need a mass-appeal product, so first of all we look for products that solve a common problem. It's got to be innovative, or at least perceived as being innovative. And it's got to demonstrate well. TV's a visual medium, so you have to show something happening. With the PedEgg, I think the biggest thing that happened was that we collected the foot shavings, so it was immediate gratification – "Oh, wow, look at all that skin." You saw it. That's what got people.

**What are your best-selling products ever?**

AmberVision sold 15 million pairs. The Smart Mop sold about 15 million pieces. We sold a State Quarters Map with slots for each of the state quarters – 12 million of those. One of our recent hits is the StickUp Bulb, which looks like a regular light bulb but works on batteries. You stick it up anywhere.

**Is the key a jazzy name?**

Products that have the function in the name are easiest to remember. For example, the Stick-Up Bulb, or the Go Duster, which spins as it goes along. We need a name that's fun, catchy, and either implies or actually tell what the product does.

**How much of a part in design and manufacturing do you play?**

Usually we'll brainstorm something like the Go Duster, but we'll have something like a handle and duster stuck together with duct tape. Then we go to an industrial design firm and have engineers design it. Then a factory in the Far East manufactures the product. It often takes six months to a year.

**Ever have a competitor beat you to market on a gizmo?**

That happened with Mighty Putty. We were working on a putty that's very powerful, something you could use to stick a towel rack to a wall. Next thing you know, we turn on the TV and there's [infomercial pitchman] Billy Mays selling a product called Mighty Putty.

**What's your most spectacular dud to date?**

Oh, there have been so many. One was the Cozy Kitty, a stuffed animal that was U-shaped, so it fit around the back of your neck. You could throw it in the microwave and heat it up and have a warm cat around your neck.

One we thought was a definite home run was the Litter Locker, which was like a Diaper Genie for cat litter. It totally bombed.

**If you weren't selling gizmos, what would you be doing?**

I can't imagine doing anything else, period. Not just professionally, but even nonwork-related. I've been doing this for 25 years. I can't imagine golfing, being retired, doing nothing. I'd rather be doing this. Isn't golf work anyway? You've got to get up early in the morning, set up your ball, hit it. It's stressful. Golf and fishing are nothing but work that people enjoy. This is work that I enjoy, so I'd rather be doing this than anything else. I love my job.

**Wait! There's more!**

Think you've got the next Doggy Steps up your sleeve? Khubani offers these tips for entrepreneur inventors:



$14.99 plus s&h    Make 120 Water Balloons at Once!    Balloon Bonanza    Click Here

**NOW ON**



Mykki Blanco reveals he's living with HIV

**Selena Gomez shows a lot of leg and more star snaps of the day**

**Twerk master Channing Tatum grinds hard at LA Pride**

SEE ALL



Death For The Dragons? How The 'Game of Thrones' Finale Changed The Game For Everyone

**The Verdict Is In: The Douchey One-Percenters Of 'Entourage' Have Become Cultural Outcasts**

**Cast Your Vote In Decider's Best Dad Ever Bracket!**

SEE ALL

VA. TECH'S INSULT TO INJURY

* **Do some research:** Got a good idea? "Google it, because the odds are someone has already come up with it," he says. Also check the Web site for the US Patent and Trademark Office, uspto.gov.

* **Diversify:** Don't get too attached to a single product. "I see this all the time – people cling to their ideas. But this is a numbers game. The majority of inventions fail, so if you're going to be in the business, you've got to come up with a lot of ideas."

* **Do it yourself:** You can pay big bucks to a patent attorney – or you can patent your own idea at uspto.gov, for $106. "That's a great resource. It's easy and user-friendly, and if you're going to be in the business, you should figure out how to do it."

* **Beware of shysters:** Plenty of firms offer to help inventors develop and market ideas, but they're generally more interested in their own revenue than yours. "They charge as much as they can, and take advantage of people's passion."

## PROMOTED STORIES


John Stamos 'Home and Well' After DUI Arrest
Good Morning America


We Tried Blue Apron: Here's What Happened
Blue Apron on Popdust


35 Instantly Regrettable Tattoos
Daily Sanctuary


13 Celebs Rumored To Be Bad In Bed
Suggest.com


10 Celebrity Couples That You Never Even Knew Were Married
Answers.com


Goldman Sachs Fails to Woo This Newly-Minted Millionaire
CNN Money

Promoted Content by

VA. TECH'S INSULT TO INJURY













EMAIL NEWSLETTERS & ALERTS    IPAD APP    RSS FEEDS
HOME DELIVERY    IPHONE APP    CONTACTS
CUSTOMER SERVICE    ANDROID APPS    CAREERS/JOBS
CLASSIFIEDS    APP HELP & FAQ    NYP STORE
ADVERTISING INFO



© 2015 NYP Holdings, Inc. All Rights Reserved
TERMS OF USE | PRIVACY | YOUR AD CHOICES

VA. TECH'S INSULT TO INJURY

EXHIBIT C3



NO. 1 IN BREAKING LOCAL NEWS

# The 'As Seen on TV' mogul in person

DECEMBER 17, 2009

BY KARL DE VRIES
OF TOWN JOURNAL | TOWN JOURNAL

As he strode to the podium of the Northern Highlands Regional High School auditorium on the afternoon of Dec. 8, surely A.J. Khubani realized that he wasn't much older than the wide-eyed teenagers in front of him when he first made it big in business.

Living at home with his parents, equipped with nothing more than a telephone, a desk, an education in business from Montclair State University and a great deal of perseverance, Khubani, now 50, emerged from his humble beginnings to become the founder and CEO of Telebrands, Inc., the empire behind those late-night "As Seen on TV" advertisements.

To the marketing students in front of him, he represented success incarnate, and they hungrily held on to his every word, anxious to soak up his wisdom.

"Many kids are worried about not being hired in the recession," said Kristin Heaney, a senior who helped organize Khubani's appearance, his fourth at Northern Highlands over the past several years. "He was encouraging to us who want to go into the business."

Saddle River resident A.J. Khubani, founder and CEO of Telebrands, Inc., speaking to Northern Highlands marketing students on Dec. 8.

And yet, to Khubani, the fundamentals of the business world survive even the toughest recessions. Having begun his business in 1982, at a time of heavy inflation and punishing unemployment, the Saddle River resident emphasized passion and careful planning in his remarks to the high school's upperclassmen.

"If you're going to start out in business, you've got to learn to conserve money," said Khubani, who first made it big in the mid 1980s after earning a $200,000 profit on massage slippers through print advertising. When he moved on to television ads a few years later, Ambervision sunglasses became his first major product, utilizing the now-classic direct response television commercials urging customers to "order now."

Twenty years later, the hokey, campy presentation of the commercials have begun a pop-culture punchline, though Khubani is the one who has the last laugh, as he reminded the students after showing an ad for PediPaws, a nail file for pets, complete with cringe-inducing animation showing the downside of ripping a nail out through clippers.

"I noticed some of you were laughing," Khubani said after the commercial finished airing, "and that's fine. It's campy on purpose. That's what people respond to." The statistics back up his claim: over the past several years, over 8 million PediPaws have been sold, and the television ad has been spoofed on shows like "Mad TV" — providing further publicity for Khubani's pitch.

He highlighted his tried-and-true approach to marketing: making sure to include the features of a product, its benefits, testimonials from those who have tried it, the offer, and finally, the call to action.

"If you don't say 'call now,' they don't call," Khubani said.

The students, all of whom were familiar with Khubani through either his celebrity, past appearances at Northern Highlands or know his daughter Sunny, a senior, or Jahan, a freshman, both of whom attend the school, recognized that one of the many strengths behind the "Infomercial King" is sometimes knowing when to pass on a product.

"I think he has a very keen eye for which products are going to be successful," said Ashley Flynne, a marketing senior who, along with the other students in attendance, is a member of the school's DECA chapter, a national business and marketing organization.

That eye for success is trained once a month during "Inventor's Day," held at Telebrands' Fairfield office. Up to 35 inventors from across the country drive over to pitch homemade inventions to Khubani who, along with his team, decide which products to test market over the course of the year.

According to a "sizzle tape" produced for a possible pilot for a Discovery Channel reality show (a crew from the network taped Khubani's Northern Highlands address), the inventors receive five minutes of unadulterated time in which to make their best offering, showing the handiness of their creations. Of the over 400 inventions that Telebrands sees every year, only 40 are test marketed at a cost of $75,000 each, with only four products total being shipped to regional shopping outlets and earning television advertising support.

And even then, the chances of success are daunting.

"We fail 90 percent of the time," said Khubani, who has gone bankrupt three times in his career, most recently in 2000. "Only 1 percent — one out of a 100 — products are commercial successes."

Still, the recession has proven to be a boon for Khubani's empire, as people are "addicted" to buying things, he said, particularly when his products usually retail around $20.

"Now is the time when you can innovate and come up with new ideas," he told the students.

Speaking with Town Journal after the hour-long presentation, Khubani declined to name a favorite product, saying he's learned not to become too attached to any one idea.

"If they're successful," Khubani said, "I love them."

E-mail: devries@northjersey.com

© 2015 North Jersey Media Group

# EXHIBIT C4

**INDUSTRY NEWS › RESIDENTIAL REAL ESTATE**

# As Seen on TV company CEO talks bankruptcy, epic comeback

Jul 7, 2014, 8:00am EDT    **Updated** Jul 9, 2014, 2:43pm EDT

**Jared Shelly**
*Philadelphia Business Journal*

Share ⌄

Ajit "A.J." Khubani created the "As Seen on TV" logo and brought popular products like AmberVision sunglasses and the PedEgg to mainstream America. He's the CEO of TeleBrands, the Fairfield, N.J.-based company that uses infomercials to bring novelty products to the masses. But his career hasn't been all roses. In fact, he went broke three different times.



DAVID KAPTEIN

AJ Khubani brought popular products like AmberVision sunglasses and the PedEgg to... **more**

Khubani sat down with the PBJ for a Q&A about his roller coaster of a career.

**Tell me the story of starting your business with just a $20,000 investment?**

I was a senior in college and I started the business because I couldn't get a job. The unemployment rate was 11 percent back in the early 1980s. I got the idea by thumbing through the National Enquirer. I noticed they did a lot of mail-order ads, and it seemed like something that was pretty easy to start. Write and ad, put it in the National Enquirer and they give you money. It took a couple of years until I started making money.

**What kinds of products did you start with in the early days?**

**HOME** OF THE DAY



**Two-Story Steps Away From the B and Marina**

See All Homes of the Day

An AM/FM Walkman. I decided I would compete with Sony Corp. They were selling Walkmen for $60, I was selling them for $10. I broke even on the first ad then decided to stop selling that product. Then I started looking for more novel products. I made money two years later with another product, massage slippers. They had little bumps on them and they massage your feet as you walk. Sold those for $10 and finally turned a profit in 1985 on $1.5 million in revenue, making me a profit of $250,000. Very exciting for a 25-year-old kid.

**Where did you get products to sell?**

I found them in Taiwan. China was still closed at the time.

**You're company has seen plenty of ups and downs. Can you explain the history?**

I made money in 1985, went broke in 1987. It's very hard to achieve success but it's even harder to maintain success. Trying to expand and get bigger, we blew all the money pretty quickly. I've gone broke three times in my life and had my house foreclosed on once. It's tough being an entrepreneur.

By 1987 I got interested in television advertising. Our first big hit was AmberVision sunglasses. It became a big hit on TV – so big that it became a household name. That gave me the idea to get into retail stores. I approached retail stores and got turned down, finally one local retailer in New Jersey, Herman's Sporting Goods, gave me a break and bought 200 pair of sunglasses initially. A week later, they ordered 20,000. That got everyone's attention and eventually we got distribution at every major retailer in the country.

**Is it true that there's a certain level of excitement for customers when they see the As Seen on TV logo in a retail store?**

I designed that logo. I never protected it. I let everyone use it. It turned out to be a good thing. Everyone used it. It became iconic. People look for it now. Inadvertently, we created the first public-platform brand. Now every retailer has a section for As Seen on TV and some retailers are experimenting with whole departments.

**Things didn't get easier in the 1990s and early 2000s. Tell me about that.**

In 1995 went broke again. Came back with a couple hot products but then had to file bankruptcy in 2000. That's when the bank foreclosed on my house that my wife and I spent two years planning and building. We were able to borrow the money for someone and save the house.

When you're an entrepreneur, everything's on the line. People don't realize that. You believe so much in it, you're willing to risk everything, as I did. It's hard to lose everything and start over again. But I think that's what separates successful entrepreneurs from unsuccessful ones – the ability to fall off your bike, get back on and keep riding.

**We've launched a new article page.** ✕

We've improved our reading experience to better serve you. You can take a
quick tour to see how we've improved.

Take a 4-Step Tour    Email Me Instead

**Infomercials are far less exciting now than in the 1980s and 90s, plus YouTube allows people to create their own videos. Where do you see As Seen on TV market going?**

The novelty of infomercials has certainly worn off. It's still a great medium for building brand recognition and selling product but we recognize that TV is going away as we know it. That's why it's much more difficult to reach viewers by TV. People will always want novel products. People don't like to read or look at photographs, they look at videos. People will continue to be inspired to buy products because of videos that sell them. You just need to get those videos to people cost effectively. We do Youtube and have an entire social media marketing department.

**What's the hottest selling product now?**

The Pocket Hose. The Hurricane Spin Mop. The hottest product of all time was the PedEgg. We still sell it, and we've sold over 50 million units.

**The PedEgg surprised you with its success and became your best-selling product of all time. Tell me about that.**

I thought it wouldn't sell. It was basically a cheese grater designed to shave calluses off your feet instead of grating cheese. That's all it was. I got the prototype and thought they got it all wrong. It doesn't look like a personal-care device, it looks like a computer mouse. It sat on my desk for about a year. I was so upset with the design. I thought yes, it looks like a computer mouse but it also looks like an egg. So I'll call it an egg. I gave it a try and we sold 50 million units.

Sign up for our free email newsletters.

**SUGGESTED** READING

**SPORTS**
Jaworski partnership buys southeastern Pa. golf course

**MEDIA AND MARKETING**
Rob Ellis departs Sportsradio 94WIP

**MEDIA AND MARKETING**
Longtime Phila. radio host resigns

**COMMERCIAL REAL ESTATE**
**Firm to buy two Center City buildings in a $200M deal**

**6 Best Credit Cards For Those With Excellent Credit**
CardRatings.com

**COMMERCIAL REAL ESTATE**
**Infamous Center City flophouse sold**

This Hoodie Is So Insanely Popular You Have To Wait Months To Get It
BI.com | American Giant Hoodie

Starr restaurant chef dies during Sunday dinner shift

Promoted Links by Taboola

EXHIBIT C5

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs



By:   Natalie A. Serock (040892010)
      Deputy Attorney General

                                    SUPERIOR COURT OF NEW JERSEY
                                    CHANCERY DIVISION,
                                    ESSEX COUNTY
                                    DOCKET NO.  ESX-C-_____-14

JOHN J. HOFFMAN, Acting Attorney General of the
State of New Jersey, and STEVE C. LEE, Acting Director
of the New Jersey Division of Consumer Affairs,

                    Plaintiffs,                        Civil Action

              v.

TELEBRANDS CORP.; JANE AND JOHN DOES 1-10,
individually   and   as   owners,   officers,   directors,
shareholders,   founders,   managers,   agents,   servants,      **COMPLAINT**
employees, representatives and/or independent contractors
of TELEBRANDS CORP.; and XYZ CORPORATIONS
1-10,

                    Defendants.

        Plaintiffs John J. Hoffman, Acting Attorney General of the State of New Jersey

("Attorney General"), with offices located at 124 Halsey Street, Fifth Floor, Newark, New

Jersey, and Steve C. Lee, Acting Director of the New Jersey Division of Consumer Affairs

("Director"), with offices located at 124 Halsey Street, Seventh Floor, Newark, New Jersey, by

way of Complaint state:

## PRELIMINARY STATEMENT

1.     Many consumers do not have the time or ability to shop at department or other retail stores. Companies, such as defendant Telebrands Corp. ("Telebrands" or "Defendant"), have responded to and profited by that need by marketing and selling a variety of products through television commercials and infomercials and websites, and providing the consumer with the seemingly easy opportunity to purchase such merchandise over the phone or internet. The products are often novel and appear to be useful, such as the "Pocket Hose" – a lightweight, pocket-sized garden hose – which will purportedly expand to a full-sized hose when in use.

2.     Many consumers who purchased merchandise from Telebrands, through what appeared to be a convenient and cost effective method, found themselves in the middle of a tortuous sequence of events.  From 2012 through July 2014, the New Jersey Division of Consumer Affairs ("Division") has received, either directly or indirectly, approximately three hundred forty (340) complaints from consumers concerning Telebrands' business practices. The consumer complaints include the following:  (a) Telebrands' aggressive solicitation of additional and/or different products (i.e., upselling); (b) Telebrands' misleading advertisements; (c) consumers' inability to obtain a refund; and (d) consumers' inability to cancel an order.  Often, consumers incurred additional charges while attempting to resolve with Telebrands the issues with their merchandise orders.  Telebrands' conduct is particularly abhorrent since such conduct is also in violation of a Final Consent Judgment and Order which resolved a prior enforcement action by the Attorney General and Director against Telebrands.

3.     Although Telebrands has provided many consumers with replacement merchandise and/or refunds, such occurred only after consumers submitted complaints, among

2

other things, to their respective state Attorneys General or Offices of Consumer Protection, the New Jersey Better Business Bureau ("BBB") and/or the Division.

4.       As detailed below, Defendant's conduct constitutes numerous violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("CFA"), and the Regulations Governing General Advertising, N.J.A.C. 13:45A-9.1 et seq. ("Advertising Regulations"). The Attorney General and the Director submit this Complaint to halt Defendant's deceptive business practices and to prevent consumers from suffering further harm.

## PARTIES AND JURISDICTION

5.       The Attorney General is charged with the responsibility of enforcing the CFA, N.J.S.A. 56:8-1 et seq., and all regulations promulgated thereunder, N.J.A.C. 13:45A-1.1 et seq. ("CFA Regulations"). The Director is charged with the responsibility of administering the CFA and the CFA Regulations on behalf of the Attorney General.

6.       By this action, Plaintiffs seek injunctive and other relief for violations of the CFA and the Advertising Regulations. Plaintiffs bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, 56:8-11, 56:8-13 and 56:8-19.

7.       Venue is proper in Essex County, pursuant to R. 4:3-2, because it is the county in which Telebrands has maintained a business address and otherwise conducted business.

8.       On December 28, 1999, Telebrands was established as a Domestic For Profit Corporation in the State of New Jersey ("State" or "New Jersey").

9.       At all relevant times, Telebrands has maintained a main business address of 81 Two Bridges Road, Fairfield, New Jersey 07004.

3

10.     The Chief Executive Officer of Telebrands is Ajit Khubani, who maintains a mailing address █████████████████████████████████████

11.     The registered agent for Telebrands is Barbara M. Pizzolato, who maintains a mailing address █████████████████████████████████████

12.     John and Jane Does 1 through 10 are fictitious individuals meant to represent the owners, officers, directors, shareholders, founders, managers, agents, servants, employees, and/or representatives of Telebrands who have been involved in the conduct that gives rise to this Complaint, but are heretofore unknown to Plaintiffs.  As these defendants are identified, Plaintiffs shall amend the Complaint to include them.

13.     XYZ Corporations 1 through 10 are fictitious corporations meant to represent any additional corporations who have been involved in the conduct that gives rise to this Complaint, but are heretofore unknown to Plaintiffs. As these defendants are identified, Plaintiffs shall amend the Complaint to include them.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     Prior Litigation and Settlement:

14.     On March 2, 2000, the Attorney General and Director filed a Complaint against Telebrands alleging, among other things, violations of the CFA and the Deceptive Mail Order Regulations, N.J.A.C. 13:45A-1.1 et seq. ("Deceptive Mail Order Regulations").

15.     As of February 16, 2001, the Attorney General and Director entered into a Final Consent Judgment and Order with Telebrands ("February 16, 2001 Final Consent Judgment and Order").

4

16. Pursuant to the February 16, 2001 Final Consent Judgment and Order, Telebrands agreed, among other things, that it would comply with the CFA and the Deceptive Mail Order Regulations and would not engage in any act or practice in violation of the CFA or the Deceptive Mail Order Regulations. Additionally, Telebrands acknowledged that any acts or practices in violation of the February 16, 2001 Final Consent Judgment and Order would subject it to enhanced penalties pursuant to N.J.S.A. 56:8-13.

**B.    Telebrands' Advertisement and Sale of Products:**

17. At all relevant times, Telebrands has been engaged in the marketing, manufacturing, packaging, distribution, offering for sale and/or sale of various consumer products that include the: (a) Pocket Hose; (b) Trusty Cane; (c) InstaBulbs; (d) Light Angel; (e) Hurricane Spin Mop; (f) Olde Brooklyn Lantern; and (g) Fresh Sticks.

18. Many of Telebrands' products are labeled with the logo "As Seen On TV" as pictured below:



19. At all relevant times, Telebrands markets, advertises and otherwise offers its products for sale to consumers in this State and elsewhere, through various mediums, including newspapers, television commercials and infomercials, and multiple websites.

20.    Among other things, Telebrands' advertisements for certain products state in bolded, large text: (a) "BUY ONE GET ONE;" (b) "2 for 1 Pick It Up Special;" (c) "Double Offer!" and (d) "Special Offer." However, at the bottom of each of these Telebrands advertisements, there is a disclosure in smaller font and/or a light color that a separate fee applies.

21.    A Telebrands' television advertisement for Fresh Sticks, a home air freshener, which aired on December 24, 2013 ("Fresh Sticks Advertisement"), included the following:



22.    The Fresh Sticks Advertisement states in large font, "Double Offer! $10." The term "Plus S&H" appears adjacent to that text in smaller font. Two lines below such text, in even smaller font, appears the statement, "Just pay sep. processing fee for Bonus Fresh Sticks."

23.    A Telebrands' advertisement for the Trusty Cane available on the product-devoted website located at https://www.trustycane.com, on July 23, 2014 ("Trusty Cane Advertisement"), included the following:



24.    The Trusty Cane Advertisement states in bolded, large font next to an image of two (2) Trusty Canes: "SPECIAL OFFER.  Buy 1 Trusty Cane, Get A Second!"  However, only in the bottom right-hand corner is there a disclosure in small font and a light color stating, "Just Pay Separate Fee."

7

25.    A Telebrands' advertisement for the Pocket Hose Ultra available on the product-devoted website, located at https://www.pockethoseultra.com, on July 24, 2014 ("Pocket Hose Advertisement"), included the following:



26.    The Pocket Hose Advertisement states "Special Offer! Get a Second 25' Pocket Hose Ultra." Only near the bottom right-hand corner of the Pocket Hose Advertisement is there a disclosure in a much smaller font stating, "Just Pay Separate Fee."

27.    A Telebrands' advertisement for the Ankle Genie available on the product-devoted website, located at https://www.anklegenie.com, on July 29, 2014 ("Ankle Genie Advertisement"), included the following:



28.    The Ankle Genie Advertisement states in large, capitalized and/or outlined font, "BUY ONE GET ONE" and "BUY ANKLE GENIE FOR ONLY $12.99, PLUS S&H, AND GET A 2ND ANKLE GENIE." Only near the bottom right-hand corner of the Ankle Genie Advertisement is there a disclosure in much smaller font and a light color stating, "Just Pay Separate Fee."

9

29.    A Telebrands advertisement for Grassology available on the product-devoted website, https://www.grassology.com, on July 30, 2014 ("Grassology Advertisement"), included the following:



30.    Next to an illustration of two (2) one (1) pound bags of Grassology and an Ultra Pocket Hose, the Grassology Advertisement states in large, bolded text, "SPECIAL OFFER", below which appears in slightly smaller font, "Get a 2nd 1 lb. bag plus the Pocket Hose Ultra."

31.    The upper portion of the Grassology Advertisement states "for only $14.99 Plus S&H." Only in the bottom right-hand corner of the Grassology Advertisement is there a disclosure in small font and a light color stating, "just pay separate fee."

32.    At all relevant times, Telebrands sells its products to consumers in this State and elsewhere, through various mediums, including a phone ordering system, websites, and up to 90,000 various retail locations.

10

C.    **Telebrands' Interactive Phone Ordering System:**

33.    At all relevant times, Telebrands has made available to consumers toll-free "800" telephone numbers for the purposes of ordering its products over the phone.

34.    Upon information and belief, Telebrands has assigned a separate toll-free "800" phone number to each product offered for sale.

35.    At varying times, consumers who have placed their merchandise orders over the phone are either connected with a live representative from Telebrands or connected with Telebrands' Interactive Voice Response System ("Telebrands IVR System"), an automated phone system.

36.    Upon information and belief, the Telebrands IVR System does not provide consumers with the option to speak with a live representative from Telebrands.

37.    Upon information and belief, the Telebrands IVR System allows the consumer to purchase merchandise over the phone by either using voice commands or inputting a number.

38.    Upon information and belief, one of the first actions taken by the Telebrands IVR System is to obtain the consumer's billing address and payment information (i.e., method of payment).

39.    At all relevant times, Telebrands has used the Telebrands IVR System to aggressively solicit orders from consumers for additional products.

40.    When Telebrands aggressively solicits orders for additional products through the Telebrands IVR System, consumers are not always provided with an option to decline the additional products.

11

41.     For example, the Telebrands IVR system may offer an additional set of Fresh Sticks to consumers and prompt consumers to say "yes" or press one (1) on their phone to add the offer, but does not provide consumers with a method to decline the offer.

42.     Consumers who were frustrated by Telebrands' aggressive solicitation through the Telebrands IVR System reported that they terminated the phone call prior to confirming the transaction only to find that they were still charged for certain products.

43.     Upon information and belief, the Telebrands IVR System fails to provide consumers with an opportunity to confirm their merchandise order prior to authorizing the charges.

44.     As a result, consumers have reported that Telebrands charged them for merchandise they did not intend to order or no longer wanted to order.

45.     As a result, consumers have reported that Telebrands charged prices for merchandise that were higher than the prices consumers expected to pay based on Telebrands' advertisements.

**D.      Telebrands' Websites:**

46.     At all relevant times, Telebrands has maintained a website located at http://www.telebrands.com ("Telebrands Website").

47.     Additionally, at all relevant times, Telebrands has maintained a website located at http://shop.telebrands.com ("Telebrands Shopping Website"). (The Telebrands Website and Telebrands Shopping Website are collectively referred to as "Telebrands Websites").

48.     At all relevant times, the Telebrands Website has directed consumers to the Telebrands Shopping Website in order to purchase products Telebrands offered for sale.

12

49.     At least as of May 2014, the Telebrands Shopping Website, offered up to forty (40) different products for sale, including the: (a) Pocket Hose; (b) Ankle Genie; (c) Aluma Wallet; and (d) Trusty Cane.

50.     Moreover, at all relevant times, the Telebrands Website has directed consumers to product-devoted websites to view infomercials and to purchase the products.

51.     For example, consumers can purchase the Hurricane Spin Mop over the internet from either the Telebrands Shopping Website or from the product-devoted website for the Hurricane Spin Mop located at https://www.hurricanemop.com.

52.     Among other things, the Telebrands Websites state:   (a) "100% Satisfaction Guarantee;" (b) "Welcome to Telebrands™ - bringing you innovative products at affordable prices for over 25 years!;" (c) "Founder, AJ Khubani, and his team search the world for useful and inventive products that help consumers save time, save money and find effective solutions to everyday challenges;" and (d) "Creator of the famous 'As Seen on TV' logo."

53.     Upon information and belief, when using Telebrands product-devoted websites, consumers report not being able to edit their virtual "shopping cart" which holds their product selections, resulting in consumers ordering products they did not intend to order or no longer wanted to order.

54.     Upon information and belief, the Telebrands product-devoted websites fail to disclose to consumers when they are actually completing the merchandise order and authorizing the charges.

55.     As a result, consumers have reported that Telebrands charged them for merchandise they did not intend to order or no longer wanted to order.

13

56.    As a result, consumers reported that Telebrands has charged them prices for merchandise that were higher than the prices the consumers expected to pay based upon Telebrands' advertisements.

57.    Consumers report closing the Telebrands Shopping Website and/or Telebrands product-devoted website after selecting a product and inputting a credit or debit card number, but before finalizing the order, only to find out that they had, in fact, completed an order and were charged for the product.

**E.    Consumer Attempts to Cancel**
**An Order or Obtain a Refund:**

58.    At all relevant times, the Telebrands Websites, Telebrands product-devoted websites, the Telebrands IVR System and the invoices/packing slips accompanying the products shipped by Telebrands have stated, among other things, "100% Satisfaction Guarantee."

59.    At all relevant times, the Telebrands Websites and Telebrands product-devoted websites have provided information regarding Telebrands' purchase, cancellation and return policies.

60.    According to the Telebrands Websites and Telebrands product-devoted websites, Telebrands provides a "30 DAY GUARANTEE ON RETURNS AND EXCHANGES."

61.    The Telebrands Website, in the section titled "Purchasing Policy," states as follows:

# Purchasing Policy

**(1) PRODUCT SALES & DELIVERY:** Most orders are shipped within 1 week of receipt. However, depending of [sic] demand for the product, some items may require up to six weeks for shipping. You should allow additional times for the shipping of products from our warehouse to you.

14

**IMPORTANT NOTE:** Customers mailing in a check or a money order must have paid separate shipping and handling for the second item in a "buy one get one free" offer. If no additional shipping is included in your check, only your original product will be shipped.

**(2) CANCELED ORDERS:** Orders can be canceled by calling 973-227-8777 only prior to payment processing. Orders that are being packaged for shipping, can not [sic] be canceled. You must include order confirmation number.

**(3) BACK-ORDERS:** If your order cannot be shipped within the stated delivery date, we will notify you of the expected ship date.

**(4) 30 DAY GUARANTEE ON RETURNS & EXCHANGES:** We will gladly accept any return within 30 days, provided the item is in new or like-new condition (see exceptions below). We will only issue a refund or send a replacement as needed once the item has been received in our warehouse.

**Exceptions to our return policy:**

* Intimate apparel (such as the Natural Bra) are not returnable for refund due to health and sanitation reasons. We will, however, send you a free replacement of any bra that you receive in a defective state (i.e. ripped, torn, or broken).

* Consumable items (such as products that can be diminished or used up) are not returnable once they have been opened. However, we will accept a return for any unused and unopened consumable item.

* All items must be returned in their original packaging along with all accessories, parts, and instructions manuals that were shipped with your original order. Our 30-day return policy starts from the day your product is received. We need to have the return package postmarked within 30 days of the date that your item was delivered (regardless of what date the product was first used).

* Shipping and handling costs are non-refundable.

*VHS Videos and DVDs may only be exchanged in the event of a manufacture defect.

**Note:** If we receive your item back in our warehouse and it does not meet our return policy terms, then we will not issue you a refund or send you a replacement. Such a return also will not be sent back to you.

**Returning Information**
Follow return information which is shipped with each package. Send all returns to the address indicated on your shipping information. Ship returns to Telebrands via GROUND method that can be tracked (UPS ground/ FedEx Ground/ USPS Priority mail).

Along with your return, be sure to include the following:

A.  Your order number and/or your complete name, address, and email address
B.  A detailed explanation regarding your reason for returning the item(s)

15

C. Information about whether you would like a refund or a replacement

-No other paperwork, invoice or preauthorization is needed for your return.

**(5) US POSTAL MAIL IN ORDERS**: Upon receipt of your check, we may wait up to 21 days for the check to clear before we can ship your order. For faster shipping, we suggest you pay by cashier's check or money order. Send you payment for the total amount (be sure to include shipping/handling costs) in US dollars only to:

Telebrands Order – Dept NET905
One Telebrands Plaza
Fairfield, New Jersey 07004

Please make your check or money order payable to **Telebrands**

A fee of $20.00 will be assessed to all bounced check [sic].

**CONTACT INFORMATION**

If you ordered from a toll free 1-800 number that was provided in a commercial that you saw on TV, or you ordered directly from one of our product-devoted websites (i.e. www.whitelight.com, www.walletowl.com):

Call 973-277-8777 or 1-800-777-4034
Monday through Friday
9:00am to 5:00pm East Cost Time

**(6) PRICING & AVAILABILITY:** All pricing and product availability are subject to change. Product may be substituted for the same like kind and quality at any time.

62.     Upon information and belief, the Telebrands IVR System fails to inform consumers of Telebrands' entire purchase, cancellation and return policies.

63.     Upon information and belief, at all relevant times, the invoices/packing slips accompanying the merchandise sold and shipped by Telebrands fail to include instructions regarding the return of merchandise.

64.     The Telebrands Website provides different instructions to consumers than the Telebrands Shopping Website and Telebrands product-devoted websites as to how to cancel an order.

16

65.    At all relevant times, the Telebrands Website provided that consumers can cancel orders as follows:

> Orders can be cancelled by calling (973) 227-8777 only prior to payment processing. Orders that are being packaged for shipping, cannot be cancelled.    You must include order confirmation number.

66.    At all relevant times, the Telebrands Shopping Website and Telebrands product-devoted websites, provide that consumers can cancel their orders as follows:

> Orders can be cancelled only prior to payment processing. Orders that are being packaged for shipping, cannot be cancelled. For all products please refer to your invoice or billing statement for the dedicated toll free number related to your purchase. If you do not have the information available you may call 855-668-1655 (Toll Free).

67.    Consumers have reported that they contacted Telebrands to cancel an order and were instructed by Telebrands customer service representative to call back within 24 to 48 hours once the order had been "entered into the system."

68.    Consumers reported that when they complied with Telebrands' instructions to call back within 24 to 48 hours, Telebrands had already been processed and shipped the merchandise order, and charged the consumers.

69.    Consumers have reported that even when they contacted Telebrands customer service to cancel an order and were provided with a cancellation number, Telebrands proceeded to ship the merchandise and charge consumers.

70.    Consumers have reported that when Telebrands shipped the merchandise they believed to have been cancelled, Telebrands customer service representatives advised the consumers to refuse delivery of the package.

17

71.     Consumers who returned the merchandise they received after they cancelled the order reported that Telebrands failed to reimburse them for shipping and handling charges.

72.     Consumers who attempted to obtain a refund after being charged for merchandise they received after they cancelled the order reported that Telebrands failed to provide a refund despite the fact that Telebrands customer service representatives indicated that a refund would be provided within a specified time period (e.g., seven (7) to ten (10) days).

73.     In general, consumers have reported that they experienced difficulty in contacting Telebrands customer service, among other things, by being placed on hold, having their calls disconnected or being unable to speak with supervisors.

**F.     Telebrands' Shipment of Non-Conforming Merchandise:**

74.     Consumers have reported that after placing their initial merchandise orders, Telebrands subsequently shipped merchandise that failed to conform to the merchandise the consumers agreed to purchase ("Non-Conforming Merchandise") and have charged consumers for such Non-Conforming Merchandise.

75.     In some instances, Telebrands has shipped Non-Conforming Merchandise to consumers and has included in the shipment a note indicating that the merchandise the consumer specifically agreed to purchase is no longer available.

76.     For example, the Telebrands' note to one consumer stated:

**Pocket Hose**

Important Notice

Thank you for your recent Pocket Hose order. The 100 foot hose you ordered is not available. We have shipped you two of the 50 foot hoses instead. Thank you again for your order and we apologize for any inconvenience we may have caused you.

77.     Upon information and belief, Telebrands does not obtain authorization from the consumer prior to shipping Non-Conforming Merchandise.

78.     Consumers who attempted to return Non-Conforming Merchandise reported that Telebrands failed to reimburse them for shipping and handling charges.

79.     In some cases, consumers reported that Telebrands offered to reimburse a small portion of the total cost of the Non-Confirming Merchandise, in exchange for the consumer keeping the Non-Conforming Merchandise.

**G.     The Division's Undercover Purchase of "InstaBulbs" on June 7, 2013:**

80.     As of part of its investigation of Telebrands, the Division made an undercover purchase of "InstaBulbs," a battery operated light bulb.

81.     On June 7, 2013, a Division Investigator, using an undercover identity, ordered InstaBulbs through the Telebrands IVR System.

82.     At that time, the Division Investigator called 1-800-519-1178, the number specific for InstaBulbs.

83.     At the beginning of the call, the Telebrands IVR System played an automated message which stated that purchases made on June 7, 2013 qualified for free shipping, a ten (10) year warranty, and receipt of a $15.00 Telebrands gift card for future purchases.

84.     The Telebrands IVR System then asked the Division Investigator to provide name, address, phone number and method of payment.

85.     After the Division Investigator provided that information and confirmed payment would be made using a credit card, the Telebrands IVR System requested that the Division

19

Investigator provide the name on the credit card and the credit card number. The Division Investigator provided this information verbally.

86.     After the Telebrands IVR System obtained payment information from the Division Investigator, it confirmed an order of one (1) set of two (2) InstaBulbs at a price of $10.99 plus $6.99 for shipping and handling.

87.     The Telebrands IVR System then asked if the Division Investigator would like to purchase an additional set of two (2) Instabulbs and pay only shipping and handling charges of $6.99. The Telebrands IVR System stated that the order was covered by a "100% money back guarantee" except for any shipping and handling charges. The Division Investigator declined the offer for the additional InstaBulbs.

88.     The Telebrands IVR System never informed the Division Investigation that Telebrands will only accept returned merchandise within thirty (30) days of receipt of the merchandise.

89.     The Telebrands IVR System then repeated the offer for the additional set of Instabulbs which the Division Investigator declined again.

90.     During the call, the Telebrands IVR System aggressively solicited the Division Investigator to purchase approximately seven (7) additional products, including: (a) a "deluxe" set of InstaBulbs, which purportedly give off a stronger light, with free shipping; (b) expedited shipping within three (3) to five (5) business days for $9.99; (c) a thirty (30) day free trial to an unnamed health and fitness club and a $25.00 Wal-Mart gift card; (d) a free thirty (30) day trial for three (3) magazines and a $50.00 Wal-Mart gift card; (e) a free three (3) night vacation near

20

Orlando, Florida for up to three (3) guests; (f) a free three (3) night vacation in Las Vegas, Nevada; and (g) a free three (3) night stay in Napa Valley, California.

91.     For some of the additional products offered, including the deluxe InstaBulbs and the expedited shipping, the Telebrands IVR System failed to provide the Division Investigator with an option to decline the additional offer.

92.     Even when the Division Investigator was able to decline the offer for an additional product, including the expedited shipping and free thirty (30) day trial for three (3) magazines, the Telebrands IVR System repeatedly asked the Division Investigator to purchase the product.

93.     Prior to concluding the call, which lasted approximately sixteen (16) minutes, the Telebrands IVR System informed the Division Investigator that the order would be delivered in four (4) to six (6) weeks.

94.     Prior to concluding the call, the Telebrands IVR System never informed the Division Investigator of the total cost of the order.

95.     On July 1, 2013, the Division Investigator received a package addressed to the undercover identity and sent from InstaBulb, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("7/1/13 Delivery").

96.     The 7/1/13 Delivery contained two (2) sets of InstaBulbs. The enclosed invoice reflected that one (1) set of InstaBulbs cost $10.99 plus $6.99 for shipping and handling, and the other set of InstaBulbs cost $6.99 for shipping and handling only ("7/1/13 Delivery Invoice").

97.     The 7/1/13 Delivery Invoice reflected a total cost of $26.72, inclusive of sales tax and shipping charges.

21

98.    Despite the fact that the Telebrands IVR System stated that purchases placed on June 7, 2013 qualified for free shipping, the Division Investigator incurred shipping and handling charges totaling $13.98 in connection with the purchase.

99.    Despite the fact that the Division Investigator declined the Telebrands IVR System's offer for an additional set of Instabulbs at a price of $6.99, the Division Investigator still received and was charged for the merchandise.

## H.    The Division's Undercover Purchase of the "Olde Brooklyn Lantern" on June 4, 2013 and Attempt to Return:

100.    As part of its investigation of Telebrands, the Division made an undercover purchase of the "Olde Brooklyn Lantern," a battery operated lighting device that is designed to resemble an antique lantern.

101.    On June 4, 2013, a Division Investigator, using an undercover identity, ordered an Olde Brooklyn Lantern through the Telebrands Shopping Website.

102.    On June 17, 2013, the Division Investigator received a package addressed to the undercover identity and sent from Telebrands.com, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("6/17/13" Delivery").

103.    The 6/17/13 Delivery contained one (1) Olde Brooklyn Lantern and the enclosed invoice reflected a total cost of $22.45, inclusive of sales tax and shipping charges ("6/17/13 Delivery Invoice").

104.    The 6/17/13 Delivery Invoice did not include any information on how to return the merchandise.

22

105. On June 17, 2013, on four (4) separate occasions, the Division Investigator called 800-310-8708, the phone number provided in the 6/17/13 Delivery Invoice, in an attempt to return the Olde Brooklyn Lantern.

106. During the Division's Investigator first call to 800-310-8708, the Telebrands IVR System played three (3) different automated messages as follows: (a) the first message instructed the Division Investigator to hang up and call an identified number if he was calling about Sterlington Collections; (b) the second message provided information about the "Everyday Savings Club" membership program and directed the Division Investigator to hang up and call an identified number for any additional information regarding the "Everyday Savings Club" membership program; and (c) the third message directed all other customers to stay on the line to speak to a representative ("Telebrands IVR System Automated Messages").

107. The Division Investigator proceeded to stay on the line in order to speak to a representative regarding the return of the Olde Brooklyn Lantern.

108. After waiting on hold for approximately four (4) minutes, the Division Investigator's call was disconnected without any notice or announcement.

109. During the time that the Division Investigator was on hold, there were no additional outgoing messages and no music or any other sound to alert the Division Investigator that the call remained on hold pending transfer to a representative.

110. The Division Investigator then called 800-310-8708 for a second time and listened to the Telebrands IVR System Automated Messages.

111.    The Division Investigator was on hold for approximately two (2) minutes until a customer service representative answered the phone and went through an introduction. However, the call was disconnected before the Division Investigator could speak.

112.    The Division Investigator then called 800-310-8708 for a third time and listened to the Telebrands IVR System Automated Messages.

113.    The Division Investigator was on hold for approximately five (5) minutes until the call was disconnected without any prior warning or announcement.

114.    During the time that the Division Investigator was on hold, there were no additional outgoing messages and no music or any other sound to alert the Division Investigator that the call remained on hold pending transfer to a representative.

115.    The Division Investigator then called 800-310-8708 for a fourth time and listened to the Telebrands IVR System Automated Messages.

116.    The Division Investigator was on hold for approximately one (1) minute until connected with a customer service representative who identified himself as Russell Cooper ("Cooper").

117.    The Division Investigator informed Cooper that he wanted to return the Olde Brooklyn Lantern he purchased on June 4, 2013. Cooper then requested that the Division Investigator provide him with the credit card number used for the purchase. The Division Investigator explained to Cooper that he did not have his credit card number, but that he had a packing slip with the order number. Cooper then directed the Division Investigator to call 1-855-235-2082 for a Return Merchandise Authorization ("RMA") for the Olde Brooklyn Lantern.

24

118.    The Division Investigator then called 1-855-235-2082, as instructed by Cooper, and listened to the Telebrands IVR System Automated Messages which also played during the four (4) calls the Division Investigator previously made to 800-310-8708.

119.    The Division Investigator was on hold for approximately one (1) minute until connected with a customer service representative who identified himself as Keith Miller ("Miller").

120.    The Division Investigator explained to Miller that he wanted to return the Olde Brooklyn Lantern he purchased on June 4, 2013. Miller then asked the Division Investigator to provide a credit card number. The Division Investigator explained to Miller that he did not have the credit card number but that he had a packing slip with the order number. Miller then requested that the Division Investigator provide a name, address and phone number.

121.    After the Division Investigator provided such information, Miller stated that he could see that the Division Investigator ordered InstaBulbs on June 7, 2013 which the Division Investigator confirmed.

122.    Miller then informed the Division Investigator that he could not see the order for the Old Brooklyn Lantern in the system and would not be able to provide the Division Investigator with a RMA without a credit card number.

123.    The Division Investigator requested to speak with a supervisor and was placed on hold for approximately three (3) minutes until he was connected with a supervisor who identified himself as Vick Williams ("Williams"). Williams explained to the Division Investigator that a credit card number was needed to verify the purchase and to provide the RMA.

124.     The Division Investigator stated that he was not willing provide the credit card number.  Williams stated that the only way to issue a refund was if the Division Investigator provided a credit card number because the Division Investigator's purchase of the Olde Brooklyn Lantern was not showing up in the purchase history.  According to Williams, the only purchase in the Division Investigator's purchase history was the InstaBulbs purchase from June 7, 2013.

125.     The Division Investigator then asked Williams for a RMA for the InstaBulbs. Williams placed the Division Investigator on hold for just under two (2) minutes and returned with a RMA.

126.     The Division Investigator's call to 1-855-235-2082 lasted approximately forty-eight (48) minutes.

127.     The Telebrands return policy, as posted on the Telebrands Websites and Telebrands product-devoted websites, states that the following information is required for a return:

       A.  Your order number and/or your complete name, address, and email address
       B.  A detailed explanation regarding your reason for returning the item(s)
       C.  Information about whether you would like a refund or a replacement

     - No other paperwork, invoice, or preauthorization is needed for your return.

128.     The Telebrands return policy, as posted on the Telebrands Websites and Telebrands product-devoted websites, does not require a credit card number to process a return.

I.     **The Division's Undercover Purchase of the "Pocket Hose" on August 8, 2013:**

129.     As part of its investigation of Telebrands, the Division made an undercover purchase of the "Pocket Hose."

26

130.    On August 8, 2013, using an undercover identity, the Division Investigator ordered a Pocket Hose through the Telebrands IVR System.

131.    At that time, the Division Investigator called 1-800-574-3173, the "800" number specific for the Pocket Hose.

132.    At the beginning of the call, the Telebrands IVR System advertised, among other things, the 25' Pocket Hose at a price of $12.99 plus $7.99 for shipping and handling.

133.    The Telebrands IVR System then asked the Division Investigator to provide payment information, including a credit card number, which the Division Investigator provided.

134.    The Telebrands IVR System then confirmed an order for one (1) 25' Pocket Hose at a price of $12.99 plus $7.99 for shipping and handling.

135.    During the call, the Telebrands IVR System aggressively solicited the Division Investigator to purchase approximately seven (7) additional products, including:   (a) an additional 25' Pocket Hose for $9.99 plus free shipping; (b) two (2) InstaBulbs for the cost of shipping and handling totaling $6.99; (c) a 50' Pocket Hose for $15.99; (d) a 75' Pocket Hose for $32.99; (e) a 100' Pocket Hose for $39.99; (f) an upgrade to the premium Pocket Hose at a price of $9.99 which included a three (3) year warranty and free shipping; and (g) priority shipping for $9.99.

136.    The Division Investigator declined to purchase all seven (7) additional products offered by the Telebrands IVR System.

137.    Even when the Division Investigator declined the offer for an additional product, including the additional 25' Pocket Hose and the 50' Pocket Hose, the Telebrands IVR System repeatedly asked the Division Investigator to purchase the product.

27

138.    During the call, the Telebrands IVR System requested that the Division Investigator provide an email address to receive email notification of the purchase and receipt. After the Division Investigator provided this information, the call was transferred to a live agent from "Partners."

139.    The live agent identified herself as Ces Lorenzo ("Lorenzo") and requested that the Division Investigator provide credit card and contact information. When the Division Investigator inquired as to why Lorenzo needed credit card information when it was already provided to the Telebrands IVR System, Lorenzo indicated that she was doing her job and wanted to avoid any errors by confirming the accuracy of the information.

140.    The Division Investigator provided Lorenzo with the requested credit card and contact information except for a phone number. Lorenzo then directed the Division Investigator to the website located at www.getorderstatus.com to check the status of the order ("Telebrands Order Status Website").

141.    The Division Investigator's call to the "800" number specific for the Pocket Hose lasted over thirty (30) minutes.

142.    Prior to concluding the call, the Telebrands IVR System never informed the Division Investigator of the total cost of the order.

143.    On August 10, 2013, the Division's Investigator received an email, addressed to the undercover identity, from applications@tagroupllc.com.  The email welcomed the Division Investigator to "Everyday Family Savings" ("August 10 Everyday Family Savings Email").

144.    The August 10 Everyday Family Savings Email stated as follows:

**From:** applications@tagroupllc.com
**Date:** August 10, 2013, 21:17:39 EDT
**To:**
**Subject: Welcome to Everyday Family Savings**
**Reply-To:** applications@tagroupllc.com

Welcome to....
Everyday Family Savings
Double the Difference Back Guarantee

You've made a great choice to be a part of Everyday Family Savings. As a preferred member, you will receive exclusive discounts on shopping, dining, groceries, travel, home, auto, pets, movies, gifts, entertainment, and so much more!  And don't forget the Double the Difference Back Guarantee.  Plus, with our 24 hour quoting service you and your family can really start reducing your out of pocket expenses.  All in all, that's thousands of ways for you to save every day!

This program was designed with our members in mind – and we've looked for every way possible to help you save.  We are confident that you will be extremely pleased with the services available through Everyday Family Savings and would appreciate hearing from you on ways we can improve our services to you.

145.    The August 10 Everyday Family Savings Email informed the Division

Investigator of certain credit card charges in conjunction with his enrollment in Everyday Family

Savings.  The August 10 Everyday Family Savings Email specifically states:

Your credit card will be charged today for 19.95 and automatically renew each month for 19.95 unless you call 866-709-7400 to cancel. These payments will show on your statement as "Preferred Shoppers".

To confirm that the access to the Everyday Family Savings program is activated you will be receiving a confirmation email in just about 48 hours. All of the information you need to access your savings plan will be included in that email, along with full details about your $500 Grocery Triple Reward bonus as well.

146.    Prior to the Division Investigator receiving the August 10 Everyday Family

Savings email, there was no indication from Telebrands that the Division Investigator would be

enrolled in the Everyday Family Savings program and automatically charged for participation in

the program.

29

147.     The August 10 Everyday Family Savings Email indicated that the Division Investigator must call the phone number provided in the email on the same day that the email was received to cancel the Everyday Family Savings membership and to avoid an initial charge of $19.95 and subsequent monthly charges of $19.95.

148.     On August 11, 2013, the Division Investigator received an email, addressed to the undercover identity, from applications@tagroupllc.com regarding Everyday Family Savings ("August 11 Everyday Family Savings Email").

149.     The August 11 Everyday Family Savings Email stated, among other things, "Congratulations! Your Everyday Family Savings membership benefits are now fully activated!"

150.     On August 27, 2013, the Division Investigator received a package addressed to the undercover identity and sent from Pocket Hose, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("8/27/13 Delivery").

151.     The 8/27/13 Delivery contained one (1) 25' Pocket Hose. The enclosed invoice reflected a total cost of $22.45 for the order, inclusive of sales tax and shipping charges.

152.     The August 10 Everyday Family Savings Email stated that payments for the Everyday Family Savings membership will be reflected on a credit card statement as "Preferred Shoppers."

153.     On October 17, 2013, the Division Investigator reviewed the August and September statements for the credit card used for the undercover purchase of the Pocket Hose on August 8, 2013. The August statement reflected a charge of $19.95 on August 10, 2013 from ADM PREFERRED SHOPPE866-709-7400" and a charge of $19.95 on September 9, 2013 from "ADM PREFERRED SHOPPE866-709-7400."

30

**J.**    **The Division's Undercover Purchase of "Instabulbs" on September 13, 2013:**

154.    As part of its investigation of Telebrands, the Division made an undercover purchase of "InstaBulbs."

155.    On September 13, 2013, a Division Investigator, using an undercover identity, ordered InstaBulbs through the Telebrands IVR System.

156.    At that time, the Division Investigator called the "800" number specific for InstaBulbs.

157.    During the call, which lasted about twenty-two (22) minutes, the Telebrands IVR System advertised a set of two (2) InstaBulbs with a ten (10) year warranty at a price of $10.99 plus $6.99 for shipping and handling.

158.    During the call, the Telebrands IVR System stated that the order was covered by a "100% money back guarantee" and that "if you don't love your InstaBulbs, just send them back for a refund of the product price."

159.    The Telebrands IVR System never informed the Division Investigator that Telebrands only accepted returned merchandise within thirty (30) days of receipt of the merchandise.

160.    The Telebrands IVR System failed to inform the Division Investigator as to the process for returning.

161.    The Telebrands IVR System then confirmed the purchase of one (1) set of InstaBulbs and asked whether the Division Investigator would like to add the "bonus" set of InstaBulbs for an additional $6.99.

162.    The Division Investigator accepted the offer for the "bonus" set of Instabulbs.

31

163.    The Telebrands IVR System then indicated to the Division Investigator that free shipping would be available with an upgrade to the InstaBulbs "deluxe" version with Krypton light bulbs, which purportedly provide brighter light, and which came with a lifetime warranty.

164.    The Division Investigator agreed to upgrade to the "deluxe" InstaBulbs.

165.    During the call, the Telebrands IVR System aggressively solicited the Division Investigator to purchase approximately nine (9) additional products, including: (a) AC adapters for the InstaBulbs at a cost of $9.99 each; (b) a Lint Lizard; (c) an Edge of Glory knife sharpener; (d) a Sticky Buddy lint roller; (e) expedited shipping; (f) a free thirty (30) day trial to a health and fitness club and a $25 Wal-Mart gift card; (g) a free three (3) night vacation near Orlando, Florida for up to three (3) guests; (h) a free three (3) night vacation in Las Vegas, Nevada; and (i) a free three (3) night vacation in Napa Valley, California.

166.    For some of the additional products offered, including the Lint Lizard and the expedited shipping, the Telebrands IVR System failed to provide the Division Investigator with an option to decline the additional offer.

167.    Even when the Division Investigator was able to decline the offer for an additional product, the Telebrands IVR System repeatedly asked the Division Investigator to purchase the product.

168.    For example, the Telebrands IVR System asked the Division Investigator whether he wanted to purchase the AC Adapter three (3) consecutive times despite the fact that he declined each offer.

169.    During the call, for some of the additional products offered, the Telebrands IVR System asked the Division Investigator how many of a particular product was to be ordered and to input the number to be purchased.

170.    For example, the Telebrands IVR System made multiple attempts to sell the Lint Lizard before the Division Investigator was able to decline the offer. The attempts to sell the Lint Lizard also included questioning how many Lint Lizards the Division Investigator wanted to order by inputting the number to be purchased.

171.    Prior to concluding the call, the Telebrands IVR System never informed the Division Investigator of the total cost of the order.

172.    On September 23, 2013, the Division Investigator received a package addressed to the undercover identity and sent from InstaBulb, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("9/23/13 Delivery").

173.    The 9/23/13 Delivery contained three (3) sets of "deluxe" InstaBulbs with a three (3) year warranty. The enclosed invoice reflected a total cost of $63.07, inclusive of sales tax ("9/23/13 Delivery Invoice").

174.    According to the 9/23/13 Delivery Invoice, the Division Investigator was not charged for shipping.

175.    According to the 9/23/13 Delivery Invoice one (1) set of deluxe Instabulbs cost $16.98 and the two (2) additional sets of deluxe Instabulbs cost $20.98.

**K.    The Division's Undercover Purchase of the Light Angel on December 27, 2013:**

176.    As part of its investigation of Telebrands, the Division made an undercover purchase of the "Light Angel," a battery operated lighting device.

33

177.   On December 27, 2013, a Division Investigator, using an undercover identity, ordered the Light Angel after viewing a television commercial which aired on December 17, 2013 ("Light Angel Commercial").

178.   An excerpt from the commercial is depicted below:



179.   During the Light Angel Commercial, the terms "Light Angel" and "Olde Brooklyn Lantern" appeared next to "12.99." Additionally, two (2) Light Angels and one (1) Olde Brooklyn Lantern were depicted.

180.   The disclosure that shipping and handling charges plus a separate fee applies to the merchandise depicted in the Light Angel Commercial was in smaller font and a light color.

181.   During the Light Angel Commercial, the Division Investigator was never informed of the total cost for purchasing the depicted merchandise.

34

182.     After viewing the Light Angel Commercial, the Division Investigator purchased the Light Angel and an Olde Brooklyn Lantern through the Telebrands IVR System.

183.     At that time, the Division Investigator called 1-800-899-9135, the "800" number identified in the Light Angel Commercial.

184.     At the beginning of the call, the Telebrands IVR System first prompted the Division Investigator to provide payment information, including a billing address and credit card number.

185.     Once the Division Investigator provided the payment information, the Telebrands IVR System stated: "Thank you, your primary order is confirmed. Additional selections will be added to your order."

186.     The Telebrands IVR System then confirmed that the Division Investigator ordered one (1) Light Angel at a price of $12.99 plus $7.99 for shipping and handling charges.

187.     In order to obtain all of the merchandise depicted in the Light Angel Commercial, the Division Investigator then had to purchase an Olde Brooklyn Lantern at a price of $9.99 and an additional Light Angel at a price of $12.99, plus $2.99 for shipping and handling.

188.     The actual charge to the Division Investigator of the merchandise depicted on the Light Angel Commercial totaled $46.95, exclusive of sales tax and shipping charges.

189.     Throughout the call, the Telebrands IVR System aggressively solicited the Division Investigator to purchase additional products, including a deluxe version of the Light Angel, free shipping and expedited handling service.

190.     The Telebrands IVR System also offered expedited handling service to the Division Investigator for a price of $9.99.

35

191.   Upon information and belief, Telebrands' expedited handling service does not expedite the delivery date. Rather, the expedited handling service expedites the preparation of the shipment of an order from the warehouse.

192.   For some of the additional products offered by the Telebrands IVR System to the Division Investigator, including a special offer Light Angel and an Olde Brooklyn Lantern, the Telebrands IVR System failed to provide an option to decline the additional offer.

193.   The Division Investigator's call to 1-800-899-9135 lasted approximately ten (10) minutes. Approximately seven (7) out of the ten (10) minutes for the call reflect solicitations to purchase additional merchandise or upsells presented by the Telebrands IVR System.

194.   Prior to concluding the call, the Telebrands IVR System never provided the Division Investigator with the total cost of the order.

195.   Prior to concluding the call, the Telebrands IVR System directed the Division Investigator to the Telebrands Order Status Website to track the status of the order.

196.   On January 10, 2014, the Division Investigator went to the Telebrands Order Status Website to track the status of the Light Angel order using the billing phone number.

197.   After the Division Investigator entered the billing phone number associated with the Light Angel order from December 27, 2013, the Telebrands Order Status Website stated, "No orders found using this criteria, please try another search instead."

198.   On January 13, 2014, the Division Investigator received a package addressed to the undercover identity and sent from Light Angel, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("1/13/14 Delivery").

199.    The 1/13/14 Delivery contained four (4) boxes which were comprised of three (3) Light Angels and one (1) Olde Brooklyn Lantern.

200.    The enclosed invoice indicated that the total cost of the merchandise was $50.24 inclusive of sales tax and shipping charges.

201.    The 1/13/14 Delivery also included a note which stated:

**Important Notice**

**Light Angel**

Thank you for your Light Angel order. The basic unit you ordered is not available. We have upgraded you to the deluxe version at no cost to you. Thank you again for your order and enjoy your Light Angels.

202.    Prior to receiving the 1/13/14 Delivery, the Division Investigator was never advised by Telebrands that the basic Light Angel, which the Division Investigator ordered on December 27, 2013, was no longer available.

203.    Upon review of the Light Angels received in the 1/13/14 Delivery, there was no indication that any of the Light Angels were, in fact, "deluxe," such as different labeling or packaging.

204.    In the 1/13/14 Delivery or otherwise, Telebrands failed to provide any information regarding the difference between the "deluxe" Light Angel and the basic Light Angel.

**L.    The Division's Undercover Purchase of the Pocket Hose on December 11, 2013:**

205.    As part of its investigation of Telebrands, the Division made an undercover purchase of the "Pocket Hose."

206. On December 11, 2013, a Division Investigator, using an undercover identity, ordered the Pocket Hose through the Telebrands product-devoted website for the Pocket Hose located at https://www.pockethose.com ("Pocket Hose Website").

207. The Pocket Hose Website advertised that the price for the Pocket Hose started at $12.99 and that there was a special offer associated with the purchase of a second pocket hose ("Special Offer Pocket Hose"). Only in a smaller font, did the Pocket Hose Website indicate that this special offer involved paying a separate fee.

208. The Pocket Hose Website offered for sale four (4) different sizes of the Pocket Hose which were presented as follows:



209. The Division Investigator selected one (1) 100' Pocket Hose at a price of $39.99 plus shipping and handling in the amount of $7.99.

210. As reflected above, the Special Offer Pocket Hose is pre-selected by the Pocket Hose Website. The Division Investigator had to unselect the Special Offer Pocket Hose in order to eliminate this additional item from the order and to avoid an additional cost of at least $17.99.

38

211.    In order to proceed with the purchase of the Pocket Hose, the Division Investigator clicked on the "Add to Cart" link on the Pocket Hose Website.

212.    The Division Investigator was then required to enter contact information, which was comprised of name, e-mail, and phone number.

213.    The Division Investigator proceeded to enter that contact information.

214.    The Division Investigator was also asked to provide a billing and shipping address which the Division Investigator provided.

215.    The Division Investigator was then asked to provide payment information which the Division Investigator provided.

216.    The Division Investigator then reviewed certain "Terms and Conditions," and checked a box acknowledging, "By clicking Complete, you hereby agree to the following Terms & Conditions."

217.    Among other things, the "Terms and Conditions" addressed the "Ordering Process," specifically stating as follows:



**☑ Terms & Conditions**

**External Links**

External links may be provided for your convenience, but they are beyond the control of the website owner and no representation is made as to their content. Use or reliance on any external links and the content thereon provided is at your own risk.

**Warranties**

The website owner makes no warranties, representations, statements or guarantees (whether express, implied in law, or residual) regarding the website. However, if expressed on the website, the website owner may offer warranties or guarantees on products delivered.

**Ordering Process**

Once credit card information is entered, the website owner may present additional offers to you. Affirmative answers to each of these additional offers presented will result in the modification of the original order and the charging of your credit card for the total amount of products or services accepted by you during this process. A confirmation page with the complete order (including additional offers) will be displayed. Hitting the "Back" button of your browser during the ordering process may reset your order to the initial offer presented on the website.

218.    After reviewing the "Terms and Conditions," and in order to proceed with the ordering process, the Division Investigator clicked on a link labeled as "Complete and Customize." This step in the ordering process is reflected below:



219.    The Division Investigator was then brought to a new page of the Pocket Hose Website labeled "Review and Customize," which stated at the top of the page: "THANK YOU! YOUR ORDER HAS BEEN PLACED. Please continue through these additional offers to receive your order number."

220.    On the "Review and Customize" page of the Pocket Hose Website, the Division Investigator was then offered four (4) additional products and services all at an additional cost.

221.    The first additional product offered to the Division Investigator through the Pocket Hose Website was the "Bonus" Pocket Hose. The offer is represented below:



222.    Although this additional Pocket Hose offer is described as a "bonus," the Pocket Hose may only be purchased for a "separate fee starting at $9.99."

223.    The Division Investigator declined the offer of the "bonus" Pocket Hose by selecting, "No Thanks," located in small, light colored text to the right of, "Yes, Please!" which was highlighted by much larger, brighter colored text.

224.    The second additional product offered to the Division Investigator through the Pocket Hose Website was advertised as "Free Shipping."  The offer is represented below:



225.    As indicated on the Pocket Hose Website, the free shipping offer only applied to the Division Investigator's order if an additional Pocket Hose was purchased for a minimum price of $12.99.

226.   The Division Investigator declined the offer for "Free Shipping" by selecting, "No Thanks," located in small, light colored text to the right of, "Yes, Please!" which was highlighted by much larger, brighter colored text.

227.   The third additional product offered to the Division Investigator through the Pocket Hose Website was "Expedited Handling."  The offer is represented below:



228.   Upon information and belief, "Expedited Handling" means that the Division Investigator's merchandise order would be processed for shipping from the warehouse on an expedited basis and not delivered to the Division Investigator on an expedited basis.

229.    The Division Investigator declined the offer for "Expedited Handling" by selecting, "No thanks," located in small, light colored text to the right of, "Yes, Please!," which was highlighted by much larger, brighter colored text.

230.    The fourth additional product offered to the Division Investigator through the Pocket Hose Website was "$10 CASH BACK ON TODAY'S ORDER!   Just For Trying Everyday Savings."   The offer is represented below:



231.    The Division Investigator declined the offer to join Everyday Savings by selecting, "No Thanks," located in small, light colored text to the right of, "Yes, Please!" which was highlighted by much larger, bright colored text.

232.    After declining the fourth additional offer, the Division Investigator was provided with a summary reflecting the total cost of the merchandise order.   The summary indicated that

the Division Investigator ordered one (1) 100' Pocket Hose for a price of $50.78, inclusive of shipping and handling charges and sales tax.

233.    The Division Investigator clicked on the link, "Confirm Order" and proceeded to the portion of the Pocket Hose Website labeled "Order Confirmation."

234.    The "Order Confirmation" page stated: "Your order is complete and will now be processed.  Be sure to print a copy of this page for your records. Please allow 3-6 weeks for delivery."

235.    On the "Order Confirmation" page of the Pocket Hose Website, the Division Investigator was also presented with a summary of charges and a nine (9) digit order number. The summary indicated that the Division Investigator ordered one (1) 100' Pocket Hose at a price of $50.78, inclusive of shipping and handling charges and sales tax.

236.    On January 8, 2014, the Division Investigator received a package addressed to the undercover identity and sent from Pocket Hose, 7850 Ruffner Avenue, Dept. 4000, Van Nuys, California 91406 ("1/8/14 Delivery").

237.    The 1/8/14 Delivery consisted of one (1) box which contained one (1) Pocket Hose.

238.    The 1/8/14 Delivery also included an invoice which indicated that the total cost of the merchandise was $51.34 inclusive of sales tax and shipping charges.

239.    Such cost differed from the $50.78 that was reflected on the Pocket Hose Website when the order was completed.

240.    The 1/8/14 Delivery also included a note which stated:

**Pocket Hose**

Thank you for your Pocket Hose order.  The basic unit you ordered is not available, so we have shipped you the deluxe version at no extra cost to you.

241.    Prior to receiving the 1/8/14 Delivery, the Division Investigator was never advised by Telebrands that the basic unit of the Pocket Hose, which was ordered on December 11, 2013, was no longer available.

242.    Although the Pocket Hose advertised by Telebrands on the Pocket Hose Website and purchased by the Division Investigator was green, the Pocket Hose in the 1/8/14 Delivery was black.

243.    With the 1/8/14 Delivery or otherwise, Telebrands failed to provide any information regarding the difference between the "deluxe" Pocket Hose and the basic Pocket Hose.

## COUNT I

### VIOLATION OF THE CFA BY THE DEFENDANT
### UNCONSCIONABLE COMMERCIAL PRACTICES

244.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 243 above as if more fully set forth herein.

245.    The CFA, N.J.S.A. 56:8-2, prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as

45

aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby...

246.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

247.    The products advertised, offered for sale and sold by Defendant, including, but not limited to the Pocket Hose, Trusty Cane, InstaBulbs, Light Angel, Hurricane Spin Mop and Olde Brooklyn Lantern, comprise merchandise within the meaning of the CFA

248.    Since at least 2012, Defendant, through its owners, officers, directors, shareholders, founder, managers, agents, servants, employees, representatives and/or independent contractors has engaged in the use of unconscionable commercial practices, false promises, misrepresentations and/or the knowing concealment, suppression or omission of material facts.

249.    Defendant has engaged in unconscionable commercial practices including, but not limited to, the following:

a.    Failing to provide consumers who place a merchandise order through the Telebrands IVR System with an opportunity to speak with a live customer service representative;

b.    Requiring a consumer's billing address and payment information (i.e. method of payment) prior to the consumer placing and confirming any order through the Telebrands IVR System;

c.    Using the Telebrands IVR System to aggressively solicit orders from consumers for additional merchandise (e.g. during InstaBulb purchase, including solicitation for at least seven (7) additional products);

d.    Using the Telebrands IVR System, to continue soliciting the purchase of a product even after the consumer has declined the offer;

46

e.  Failing to provide consumers with a means to decline solicitations for additional products through the Telebrands IVR System;

f.  Failing to provide consumers with an opportunity to confirm the cost of merchandise prior to completing an order through the Telebrands IVR System;

g.  Failing to provide consumers with an opportunity to confirm the cost of merchandise prior to completing an order through Telebrands product-devoted websites;

h.  Failing to provide consumers with a means to opt out of the ordering process while attempting to place an order through the Telebrands IVR System;

i.  Failing to provide consumers with a means to edit their virtual shopping carts on the Telebrands product-devoted websites, resulting in consumers ordering merchandise they did not intend to order or no longer wanted to order;

j.  Charging consumers for merchandise that they did not intend to order or no longer wanted to order;

k.  Charging consumers prices for merchandise that were higher than the prices consumers expected to pay based upon the Telebrands advertisements;

l.  Completing an order and charging consumers for merchandise selected through the Telebrands product-devoted websites prior to consumers finalizing their orders;

m.  Making it difficult for consumers to decline additional solicitations through Telebrands product-devoted websites by obscuring the "No Thanks" link through the use of small text in a light color;

n.  Charging and shipping to consumers additional merchandise that the consumers declined to purchase while placing an order through the Telebrands IVR System;

o.  Charging consumers more than the total reflected in the summary of charges presented to consumers who purchase merchandise through Telebrands product-devoted websites;

p. Providing different instructions in the Telebrands Website from the Telebrands Shopping Website and Telebrands product-devoted websites as to cancellation of orders;

q. Instructing consumers who are attempting to cancel merchandise orders to call back within 24 to 48 hours, but proceeding to process and ship merchandise and charge consumers in the interim;

r. Charging consumers and shipping products to them after assuring consumers that their orders were cancelled (e.g. providing cancellation number);

s. Shipping and charging consumers for Non-Conforming Merchandise without prior authorization (e.g. shipping two (2) 50-foot Pocket Hoses in lieu of the 100-foot Pocket Hose ordered);

t. Requiring consumers who received Non-Conforming Merchandise without their knowledge or authorization to ship the Non-Conforming Merchandise back to the Defendant at the consumer's expense;

u. Failing to provide consumers who returned Non-Conforming Merchandise with a refund of the initial shipping and handling charges;

v. Requiring consumers who received merchandise after cancelling orders to ship the merchandise back to the Defendant at the consumer's expense;

w. Failing to provide consumers who received merchandise after cancelling orders with refund of the initial shipping and handling charges;

x. Charging consumers for merchandise that they did not order;

y. Making it difficult for consumers to contact and communicate with Defendant's customer service, including placing calls on hold for lengthy periods of time, disconnecting calls and/or failing to connect consumers with supervisor;

z. Requiring a consumer to provide a credit card number in order to obtain a RMA or otherwise to return merchandise when such information is not required as part of Defendant's return policy, as posted on the Telebrands Websites and the Telebrands product-devoted websites;

aa. Offering for sale "deluxe" versions of various products when there is no meaningful difference between the "deluxe" and "basic" or "standard" version of the product;

48

bb.    Enrolling a consumer in the "Everyday Family Savings" program, and automatically charging a monthly enrollment fee, without prior authorization;

cc.    Requiring a consumer to cancel membership in the "Everyday Family Savings" program on the same day the consumer is notified of his/her enrollment;

dd.    Directing consumers to the Telebrands Order Tracking Website to track the status of a merchandise order when the Telebrands Order Tracking Website fails to provide such information;

ee.    On the Telebrands product-devoted websites (e.g. Pocket Hose Website), requiring consumers to unselect additional merchandise, which has been pre-selected by default, from their order;

ff.    On the Telebrands product-devoted websites, (e.g. Pocket Hose Website), offering consumers additional products and services at additional cost, even after consumers have placed their orders and provided credit card information; and

gg.    On the Telebrands product-devoted websites, (e.g. Pocket Hose Website), offering additional products and services where the "Yes, Please!" is prominently displayed while the "No Thanks" appears in much smaller font and a lighter color.

250.    Each unconscionable commercial practice by Defendant constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

## COUNT II

### VIOLATION OF THE CFA BY THE DEFENDANT
### FALSE PROMISES AND/OR MISREPRESENTATIONS

251.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 250 above as if more fully set forth herein.

252.    Defendant's conduct in violation of the CFA includes, but is not limited to, the following false promises and/or misrepresentations:

49

a.    Representing to consumers through the Telebrands IVR System that purchases placed on a specific day qualified for free shipping, when such is not the case;

b.    Representing that Defendant has cancelled a merchandise order and would neither charge the consumer nor ship the merchandise, when such is not the case;

c.    Representing that Defendant had or was processing consumers' requests for refunds, when such was not the case;

d.    Representing that Defendant provides a "100% Satisfaction Guarantee" when such is not the case.

e.    Representing an offer for "free shipping" through the Telebrands IVR System when, in fact, free shipping only applies if additional merchandise is ordered.

f.    Representing an offer for "free shipping" through the Telebrands IVR System, when, in fact, free shipping only applies to the purchase of a single product and does not apply to the entire order;

g.    Representing to a consumer that credit card information is needed to return merchandise when such is not the case; and

h.    Representing to a consumer that a RMA is needed to return merchandise when such is not the case.

253.    Each false promise and/or misrepresentation by Defendant constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

## COUNT III

### VIOLATION OF THE CFA BY THE DEFENDANT
### (KNOWING OMISSIONS OF MATERIAL FACT)

254.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 253 as if more fully set forth herein.

255.    Defendant's conduct in violation of the CFA includes, but is not limited to, the following knowing omissions of material fact:

50

a.    In the Telebrands product-devoted websites, failing to disclose to consumers that they are completing their merchandise order and authorizing payment for the merchandise;

b.    Failing to inform consumers who place merchandise orders through the Telebrands IVR System of Defendant's entire purchase, cancellation and return policies;

c.    Failing to inform consumers who place merchandise orders through the Telebrands IVR System that Defendant will only accept merchandise returns within thirty (30) days of the consumer's receipt of the merchandise;

d.    Failing to inform consumers who place merchandise orders through the Telebrands IVR System of the total cost of the order;

e.    Failing to include in the invoices/packing slips accompanying Telebrands merchandise, instructions regarding the return of merchandise; and

f.    Failing to notify consumers that the merchandise ordered is no longer available.

256.    Each knowing omission of material fact by Defendant constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

## COUNT IV

### VIOLATION OF THE ADVERTISING
### REGULATIONS BY DEFENDANT

257.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 256 above as if more fully set herein.

258.    The Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq., promulgated pursuant to the CFA, among other things, address advertising practices.

259.    The Advertising Regulations define "Advertisement" as:

> any attempt by an advertiser . . . to directly or indirectly induce the purchase or rental of merchandise at retail, appearing in any newspaper, magazine, periodical, catalog, circular, in-store or out-of-store sign or other written matter placed before the consuming

51

public, or in any radio broadcast, television broadcast, electronic medium or delivered to or through any computer.

[N.J.A.C. 13:45A-9.1]

260.    Further, the Advertising Regulations provide, in pertinent part:

(a)    Without limiting the application of N.J.S.A. 56:8-1 et seq., the following practices shall be unlawful with respect to all advertisements:

. . . .

5.    The use of any type, size, location, lighting, illustration, graphic depiction or color resulting in the obscuring of any material fact. Disclaimers permitted or required under this section, such as 'terms and conditions apply' and 'quantities limited,' shall be set forth in a type size and style that is clear and conspicuous relative to the other type sizes and styles used in the advertisement.

. . . .

9.    The making of false or misleading representations of facts concerning the reasons for, existence or amounts of price reductions, the nature of an offering or the quantity of advertised merchandise available for sale.

[N.J.A.C. 13:45A-9.2(a)(5), (9)]

261.    Through its advertisement and offering for sale of merchandise, Defendant has engaged in the following conduct in violation of the Advertising Regulations, N.J.A.C. 13:45A-9.2(a)(5):

a.    In Defendant's Fresh Sticks Advertisement, obscuring the material fact that the "Double Offer!" of forty (40) Fresh Sticks, two (2) vases and a Forever Fragrant Hangit requires the consumer to pay a separate processing fee;

b.    In Defendant's Trusty Cane Advertisement, obscuring the material fact that the "SPECIAL OFFER" of "Buy 1 Trusty Cane Get a Second" requires the consumer to pay a separate fee;

52

     c.     In Defendant's Pocket Hose Advertisement, obscuring the material fact that the "SPECIAL OFFER" of an additional Pocket Hose Ultra requires the consumer to pay a separate fee;

     d.     In Defendant's Ankle Genie Advertisement, obscuring the material fact that "BUY ONE GET ONE" offer requires a consumer to pay a separate fee;

     e.     In Defendant's Grassology Advertisement, obscuring the material fact that the "SPECIAL OFFER" for a second one (1) pound bag of Grassology plus the Pocket Hose Ultra requires the consumer to pay a separate fee; and

     f.     In Defendant's Light Angel Advertisement, obscuring the material fact that the offer of two (2) Light Angels and an Olde Brooklyn Lantern for $12.99 required the consumer to pay a separate fee plus shipping and handling charges.

     262.     Through its advertisement and offering for sale of merchandise, Defendant has engaged in the following conduct in violation of the Advertising Regulations, N.J.A.C. 13:45A-9.2(a)(9):

     a.     In Defendant's Fresh Sticks Advertisement, using the term "Double Offer!" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

     b.     In Defendant's Trusty Cane Advertisement, using the term "SPECIAL OFFER" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

     c.     In Defendant's Pocket Hose Advertisement, using the term "SPECIAL OFFER" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

     d.     In Defendant's Ankle Genie Advertisement, using the term "BUY ONE GET ONE" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

     e.     In Defendant's Grassology Advertisement, using the term "SPECIAL OFFER" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

f.      In Defendant's Light Angel Advertisement, demonstrating two (2) Light Angels and an Olde Brooklyn Lantern for $12.99, when the actual charge to a consumer for such merchandise totaled $46.95, exclusive of sales tax and shipping charges;

g.      In Defendant's Pocket Hose Website, using the term "SPECIAL OFFER" to imply a free or discounted product when, in fact, the consumer must pay additional fees;

h.      In Defendant's Pocket Hose Website, using the term "Free Shipping" to imply a free or discounted service when, in fact, the consumer must purchase an additional product; and

i.      In Defendant's Pocket Hose Website, using the term "Expedited Handling" when such means shipping from Defendant's warehouse, rather than to the consumer, on an expedited basis.

263.    Each violation of the Advertising Regulations by Defendant constitutes a per se violation of the CFA, N.J.S.A. 56:8-2.

## COUNT V

### VIOLATION OF THE
### FEBRUARY 16, 2001 FINAL CONSENT JUDGMENT
### AND ORDER BY DEFENDANT

264.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 263 as if more fully set forth herein.

265.    Pursuant to the February 16, 2001 Final Consent Judgment and Order, Defendant, among other things, agreed that it would comply with the CFA and the Deceptive Mail Order Regulations and would not engage in any act or practice in violation of the CFA or the Deceptive Mail Order Regulations.

266.    As set forth herein, Defendant continues to engage in acts and practices in violation of the CFA and the February 16, 2001 Final Consent Judgment and Order.

267.    Such conduct constitutes second and subsequent violations of the CFA, subject to

a penalty of up to $20,000 per violation pursuant to N.J.S.A. 56:8-13.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that

the Court enter judgment against Defendant:

(a)    Finding that Defendant's acts and omissions constitute multiple violations of the CFA, N.J.S.A. 56:8-1 et seq., and the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq.;

(b)    Permanently enjoining Defendant and, its owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, corporations, subsidiaries, affiliates, successors, assigns and all other persons or entities directly under its control, from engaging in, continuing to engage in, or doing any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq., including but not limited to, the act and practices alleged in this Complaint;

(c)    Ordering Defendant to disgorge all funds and property (real and personal) acquired and/or retained as a result of any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq., including but not limited to, the acts and practices alleged in this Complaint;

(d)    Directing Defendant to restore to any affected person, whether or not named in this Complaint, any money or real or personal property acquired by means of any practice alleged herein to be unlawful and found to be unlawful, as authorized by the CFA, N.J.S.A. 56:8-8;

(e)    Directing Defendant to pay the maximum statutory civil penalties, including enhanced penalties, for each violation of the CFA, in accordance with N.J.S.A. 56:8-13;

(f)    Directing Defendant to pay costs and fees, including attorneys' fees, for the use of the State, as authorized by the CFA, N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

(g)     Granting such other relief as the interests of justice may require.

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Natalie A. Serock
Deputy Attorney General

Dated:  August 7, 2014
        Newark, New Jersey

56

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in controversy in this action involving the aforementioned violations of the CFA, is not the subject of any other action pending in any other court of this State. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I also certify that there is no other party who should be joined in this action at this time.

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Natalie Serock_

Natalie A. Serock
Deputy Attorney General

Dated: August 7, 2014
Newark, New Jersey

57

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Natalie Serock_
Natalie A. Serock
Deputy Attorney General

Dated: August 7, 2014
Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Deputy Attorney General Natalie A. Serock is hereby designated as trial counsel for the Plaintiffs in this action.

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Natalie Serock_
Natalie A. Serock
Deputy Attorney General

Dated: August 7, 2014
Newark, New Jersey

58